UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALEA NORTH AMERICA COMPANY and
RLI INSURANCE COMPANY, as subrogees of
350 Audobon Holding LLC,

                                  Plaintiffs,         **REPORT AND**
                                                                    **RECOMMENDATION**

                    -against-

                                                                    06-CV-2356 (SLT)

POLY PHASE ASSOCIATES and ABDUL
QUIYUM, a/k/a ABDUL KAIYUM KHAN, a/k/a
MOHAMMED ABDUL QUAIYUM,

                                  Defendants.
----------------------------------------------------------X

On May 18, 2006, plaintiffs Alea North America Company ("Alea") and RLI Insurance Company ("RLI"), as subrogees of 350 Audobon Holding LLC ("Audobon"), commenced this suit against defendants Poly Phase Associates ("Poly Phase") and Abdul Quiyum, a/k/a Abdul Kaiyum Khan, a/k/a Mohammed Abdul Quaiyum ("Quiyum"), seeking to recover monies paid to Audobon by Alea and RLI under their respective commercial insurance policies based on fire damage sustained by Audobon.

Despite proper service, defendants failed to answer or otherwise respond to the Complaint, and plaintiffs filed an application for entry of default judgment. The Clerk of Court entered default against defendants on November 7, 2006, and the matter was referred to the undersigned on January 11, 2008 to conduct an inquest and prepare a Report and Recommendation on the issue of damages. (See Referral Order, dated January 11, 2008).

For the foregoing reasons, this Court respectfully recommends that plaintiffs be awarded

$242,962.47 in damages, litigation expenses in the amount of $523.00, and interest accrued both pre- and post-judgment.

## FACTUAL BACKGROUND

Audobon is the owner of certain premises located at 350 Audobon Avenue, New York, New York (the "Premises"). (Compl.[1] ¶ 1). On or about September 28, 2005, plaintiff Alea issued a commercial property insurance policy to Audobon covering property damage to the Premises for the period August 25, 2005 through June 20, 2006 (the "Alea Policy"). (Id. ¶ 12). Plaintiff RLI also issued a commercial property insurance policy to Audobon on or about September 30, 2005, which covered property damage to the Premises for the period August 25, 2005 through June 20, 2006 (the "RLI policy," collectively, the "Policies"). (Id. ¶ 13). The RLI policy provided indemnification for the deductible associated with the Alea policy. (Id.)

In or about September 2005, Audobon entered into a contract with defendant Poly Phase, pursuant to which Poly Phase was to furnish and install a Firestone roofing system at the Premises. (Id. ¶ 15). Plaintiffs allege that at the time of the contract, it was represented to Audobon that Poly Phase had sufficient general liability insurance to cover the work to be performed. (Id. ¶ 15). Plaintiffs allege that although Poly Phase had an insurance policy, it only covered painting and masonry, and, in any event, unbeknownst to Audobon, the policy was cancelled on November 30, 2005 for non-payment of the premiums. (Id. ¶ 17).

In the Complaint, plaintiffs allege that on December 13, 2005, employees of defendant

---

[1]Citations to "Compl." refer to plaintiffs' Complaint, filed May 18, 2008.

Poly Phase used a torch to install roofing material on the Premises. (Id. ¶ 19). Plaintiffs further allege that a fire broke out on the roof caused by the negligent use of the torch by Poly Phase employees, resulting in damage to the Premises. (Id.; see also Pls.' Aff.[2] ¶ 5).

As a result of the fire, plaintiff Alea paid to the insured Audobon the cost of repairs and lost rents suffered. (Pls.' Aff. ¶ 4; n.1). The Alea policy contained a $25,000 deductible, $20,000 of which was paid to Alea by RLI, as a subrogee of Audobon on RLI's policy with Audobon. (Id.) Audobon then absorbed the $5,000 balance of the $25,000 deductible. (Id.)

On May 18, 2006, plaintiffs commenced this action against defendants, alleging breach of contract, negligence, negligence per se, negligent misrepresentation and fraud. (Compl. ¶¶ 24-47). Plaintiffs claim that they attempted to personally serve defendant Quiyum at his last known address at 347 MacDonald Avenue, Apt. C4, Brooklyn, New York, on four separate occasions, June 3, 2006, June 23, 2006, June 28, 2006, and June 29, 2006. Eventually, the process server affixed a copy of the summons and complaint to Quiyam's door and thereafter mailed a copy of the same address in compliance with New York Civil Practice Law and Rules § 308(4).

Plaintiffs also attempted to locate and serve defendant Poly Phase, determining that an entity identified as Poly Phase Construction, Inc. was incorporated in the State of New York. (Pls.' Aff. ¶ 7). Although plaintiffs served copies of the summons and complaint on the New York Secretary of State, the Secretary of State's records indicate that this entity is an inactive corporation. (Id. ¶ 8; Ex. B). Since it is not clear that this entity was one of the contracting parties to the roofing contract and since plaintiffs have reason to believe that Poly Phase is a sole

---

[2]Citations to "Pls.' Aff." refer to plaintiffs' Affirmation for Judgment by Default Against Defendant Abdul Quiyum, dated November 6, 2006.

3

proprietorship owned by defendant Quiyum, plaintiffs only seek a default judgment against defendant Quiyum. (Pls.' Aff. ¶¶ 7-9).

When defendants failed to appear, plaintiffs filed a Motion for Default Judgment on November 6, 2006 pursuant to Fed. R. Civ. P. 55(a). In support of their Motion for Default Judgment, plaintiffs assert that they are seeking to recover from defendant Quiyum only the damages representing the actual cash value of the loss suffered by the insured Audobon. (Pls.' Aff. ¶ 12).

On November 7, 2006, this court certified that defendant Quiyum was personally served with copies of the Summons and Complaint in compliance with Fed. R. Civ. P. 4(e), 4(l), when a copy of the relevant documents was affixed to defendant's dwelling on June 29, 2006, and a second copy was mailed to defendant's home on July 5, 2006.[3] (Clerk's Notation of Default, filed November 7, 2006). On January 11, 2008, the matter was referred to the undersigned to conduct an inquest and prepare a Report and Recommendation on the issue of damages.

## DISCUSSION

A. Service

As an initial matter, it is clear that "[a] court may not properly enter a default judgment unless it has jurisdiction over the person of the party against whom the judgment is sought, 'which also means that he must have been effectively served with process.'" Copelco Capital,

---

[3]Plaintiffs assert that they resorted to the "nail and mail" procedure only after four earlier attempts to serve a person of suitable age and discretion proved unsuccessful. (See Pls.' Aff., Ex. C, Affidavits of Jay Mitchell, personal process server, dated June 20, 2006 and July 5, 2006 ("Mitchell Aff. 1" & "Mitchell Aff. 2")).

4

Inc. v. General Consul of Bol., 940 F. Supp. 93, 94 (S.D.N.Y. 1996) (internal citation omitted). As the Supreme Court noted in Henderson v. United States, 517 U.S. 654 (1996), "the core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." Id. at 672. The Second Circuit has further indicated that the notice must be "reasonably calculated to provide actual notice of the action." See National Dev. Co. v. Triad Holding Corp., 930 F.2d 253, 258 (2d Cir.) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)), cert. denied, 502 U.S. 968 (1991). It is well-established that "[w]hen the defendant challenges the sufficiency of service of process, the burden of proof is on the plaintiff to show the adequacy of service." Blue Ocean Lines v. Universal Process Equip., Inc., No. 93 CV 1722, 1993 WL 403961, at *4 (S.D.N.Y. Oct. 7, 1993) (internal citation omitted); accord Bey v. United States Postal Serv., No. 03 CV 4081, 2005 WL 2923516, at *1 (S.D.N.Y. Nov. 4, 2005). However, where a defendant has notice of the proceedings, he "'bears the burden of establishing the claim that service was not properly effected.'" See Burda Media, Inc. v. Viertel, 417 F.3d 292, 299 (2d Cir. 2005) (citing CSC Holdings, Inc. v. Fung, 349 F. Supp. 2d 613, 616 (E.D.N.Y. 2004)). See also Kotlicky v. U.S. Fid. & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987).

In this case, plaintiffs' submissions indicate that the process server properly served defendant Quiyum with copies of the Summons and Complaint through substituted service by affixing a copy to the door of his residence, located at 347 MacDonald Avenue, Apt. C4, Brooklyn, New York, and then by mailing copies to that address. (Pls.' Aff., Ex. C; Mitchell Aff. 1). Plaintiffs' process server further avers that he exercised due diligence by attempting to

personally serve plaintiff on four separate occasions prior to resorting to the use of substituted service pursuant to Rule 4(c)(1). (Id.) See Hardy v. Kaszycki & Sons Contractors, Inc., 842 F. Supp. 713, 717 (S.D.N.Y. 1993) (holding that more than two attempts at personal service suffices to show due diligence, especially when some are during non-business hours).

Given that defendant has not appeared to contest service, the Court finds that the plaintiffs' efforts at service were in accordance with Fed. R. Civ. P. 4(e) and (l).

B. Default Judgment

Rule 55 of the Federal Rules of Civil Procedure sets forth a two-step process in which first a default, and then a default judgment, is entered. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993). The court clerk automatically enters the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by noting the party's default on the clerk's record of the case. See id.; Fed. R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default"). After a default has been entered against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), a default judgment may be entered. See Fed. R. Civ. P. 55(b). If the amount of damages must be ascertained in order for default judgment to be entered, the court may conduct a hearing. See Fed. R. Civ. P. 55(b)(2); Enron Oil Corp. v. Diakuhara, 10 F.3d at 95.

In determining whether a default judgment should enter, courts have cautioned that a default judgment is an extreme remedy that should only be granted as a last resort. See Meehan

v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance the interest in expediting cases with the court's responsibility to "afford[ ] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored," and any doubts should be resolved in favor of the defaulting party. Id. Accordingly, the plaintiff is not entitled to a default judgment as a matter of right, simply because the defendants are in default. See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (stating that courts are required to "supervise default judgments with extreme care to avoid miscarriages of justice").

The court possesses significant discretion, and may consider a number of factors in deciding whether to grant a default judgment, including whether the grounds for default are clearly established and the amount of money potentially involved. See Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). The greater the amount of money involved, the less justification there may be for entering the default judgment. See id. Additionally, a court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. See Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A Fed. Practice & Procedure, §§ 2685, 2688 (3d ed. 1998).

When a default judgment is entered, the defendant is deemed to have admitted all of the

well-pleaded factual allegations in the complaint pertaining to liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993); see also Montcalm Publ'g Corp. v. Ryan, 807 F. Supp. 975, 977 (S.D.N.Y. 1992) (gathering cases). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158; Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Plaintiffs allege that defendants' employees' careless use of a torch, while performing contracted work on the Premises, caused the December 13, 2005 fire in breach of the agreement between the parties. In addition, plaintiffs allege claims of negligence, negligence per se, and negligent misrepresentation and fraud, entitling plaintiffs to recovery of all damages for which defendants are liable. (Compl. ¶¶ 28-32). The uncontested allegations in the Complaint establish the elements of liability necessary to state a claim for breach of contract and negligence. See Continental Ins. Co. v. Atlantic Cas. Ins. Co., No. 07 CV 3635, 2008 WL 3852046, at *1 (S.D.N.Y. Aug. 13, 2008) (noting that default judgment was entered against the party whom plaintiff alleged had negligently installed the roof of a residence, causing a fire and the resulting damage).

Furthermore, it is beyond dispute that defendant is in default. Defendant Quiyum has not responded to the Complaint. See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that "[the defendant's] default is crystal clear – it does not even oppose this motion"). Not only has defendant failed to answer or otherwise move with respect to the Complaint, he has also failed to respond to plaintiffs' motion for entry of a default judgment.

On January 11, 2008, the matter of the Default Judgment was referred to the undersigned for an inquest and preparation of a Report and Recommendation on the issue of damages. (See Referral Order, dated January 11, 2008). A copy of this Order was sent to defendant on January 14, 2008. Defendant failed to submit papers and failed to appear at the inquest hearing on September 5, 2008. Therefore, the Court considers defendant to have waived the right to challenge damages claimed by plaintiffs. Given the numerous opportunities afforded the defendant, and his apparent lack of interest in participating in these proceedings, there is no compelling reason for further delay.

C. Damages

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiffs to establish their entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158, 161. While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (gathering cases), aff'd, 873 F.2d 38 (2d Cir. 1989).

Here, plaintiffs have filed reasonably detailed affidavits and exhibits pertaining to the damages incurred, and appeared at an evidentiary hearing held before this Court on September 5, 2008. Following that proceeding, plaintiffs submitted certain additional information in a letter dated September 12, 2008 and exhibits submitted therewith. Defendants have failed to make an appearance or respond and present evidence on the issue of damages. Thus, the Court can make

an informed recommendation regarding damages based on the evidence before it.

1) Calculation of Damages

a. Building Damages

Plaintiffs have submitted a Damages Presentation,[4] with supporting documentation, providing a calculation of Audobon's total damages associated with the December 13, 2005 fire. The damages claimed for repairs to the Premises include both emergency repairs necessary to maintain the building's structural integrity, which were performed immediately after the fire, and the extensive repairs that were required to restore the building to its prior state of habitability. On December 19, 2005, the insured Audobon paid $6,250 to Delta General Contracting & Management Inc. for necessary emergency repairs. (Pls.' Aff. Ex. D at RC 0003, 0005). Plaintiff Alea reimbursed Audobon for these costs. (Pls.' Aff. Ex. D-8 at RC 0064 (Sworn Statement in Proof of Loss)).

On December 28, 2008, an appraisal was prepared by Public Adjuster, Affiliated Adjustment Group, Ltd. ("Affiliated") at the request of insured plaintiff Audobon, pursuant to New York State Insurance law.[5] Affiliated submitted a report estimating the total cost of repair to be $450,179.46. (Pls.' Aff. Ex. D-4 at RC 0006 - RC 0021). Plaintiff Alea then

---

[4]Citations to "Damages Presentation" and its "Sub-Exhibits" (D-1 through D-8) refer to Exhibit D of plaintiffs' Affirmation for Judgment by Default Against Defendant Abdul Quiyum, dated November 6, 2006.

[5]N.Y. Ins. § 3404 (2008).

commissioned a separate appraisal from Blaise Muscianesi Associates, Inc. ("Muscianesi"),[6] who prepared a report estimating the total cost of repair at $331,023.00. (Pls.' Ex. D-5 at RC 0049; see also Muscianesi Letter and Certification, dated September 11, 2008). Alea reimbursed the insured Audobon in accordance with the Muscianesi lower estimate. (Pls.' Aff. Ex. D-8 at RC 0064 (Sworn Statement in Proof of Loss)).

The Muscianesi report is broken down into an estimate of the cost of reports by trade-- namely, carpentry, masonry, electric, painting, etc. (see Pls.' Aff. Ex. D at RC 00024) -- and by area of the apartment building -- namely, roof, exterior and by individual apartment. (Id. at RC 0025-0048). The net loss, as estimated by Muscianesi amounts to $266,203.00, to which was added $26,620.00, representing 10% overhead, plus $29,282.00, representing an additional 10% in profit.[7] In addition, 8.375% was added as tax on the materials for a total of $331,023.00. When added to the $6,250.00 in emergency repairs, the total loss, before subtracting the deductible of $25,000 was $337,273.00. Plaintiffs' counsel represents that the repairs on the building were actually made. (Pls.' Letter, dated Sept. 12, 2008 at 1).

---

[6]In response to this Court's request at the inquest hearing for information relating to the qualifications and experience of Muscianesi, Blaise Muscianesi, former principal, now retired, of Muscianesi, submitted a certification that he had previously filed in another action, detailing his expertise and experience. (Certification of Blaise Muscianesi, filed September 12, 2008).

[7]According to the representations of Muscianesi in a letter to the Court, dated September 11, 2008, the 10% overhead represents the indirect costs of construction which the contractors include in their estimates and the 10% profit reflects the profit a contractor would expect to earn. (Muscianesi Letter at 1). The letter further notes that based on the customary practice in the industry in New York City, the combined profit and overhead would normally be closer to 30%, making the 20% figure contained in the estimate "very conservative." (Id.)

Although plaintiffs asserted a number of claims against defendant in their Complaint,[8] for purposes of this inquest on damages, plaintiffs seek only the actual cash value of the total loss. (Pls.' Aff. ¶ 12). Given that the total building repairs, including the cost of emergency repairs, amounted to $337,273.00, plaintiffs seek this amount in damages minus a depreciation value[9] of $104,817.94, for a total amount sought of $207,455.06. (Pls.' Aff. Ex. D-3 at RC 0005). Having reviewed the extensive documentation submitted by plaintiffs, the Court finds that the amounts requested for repairs to the building, adjusted for depreciation, are reasonable.

### b. Rent Loss

Plaintiffs allege that, as a result of the fire, the insured Audobon also suffered a loss of rents in the amount of $10,507.41. (Pls.' Aff. ¶ 13). According to the documentation submitted by plaintiffs, the insured Audobon actually estimated its rent loss at $16,592.21. (Pls.' Aff. Ex. D-7 at RC 0052). Plaintiffs, however, seek only $10,507.41, reflecting the adjustment prepared by a representative of Affiliated. (See Pls.' Aff. Ex. D-7 at RC 0052). This adjusted claim was ultimately paid. (Pls.' Aff. Ex. D-8 at RC 0051, RC 0067 (Sworn Statement in Proof of Loss)).

Having reviewed the plaintiffs' request for lost rents, the Court finds it to be reasonable.

---

[8] See Compl. ¶¶ I-V at 8-9.

[9] As counsel explained at the hearing, at the time of the fire, the building was not new, and some of the areas of the building were in need of repair even prior to the destruction caused by the fire. Thus, a depreciation value was determined and subtracted from the amount sought. (See Pls.' Aff., Ex. D at RC 0005).

12

c. Deductible

Having reviewed plaintiffs' motion papers and supporting documentation, the Court finds that the total amount of damage incurred by the insured Audobon, including building repairs and lost rents, equals $217,962.47. Given that plaintiff Alea paid this sum to Audobon after deduction of the $25,000 deductible under Alea's policy, it is respectfully recommended that plaintiff Alea be awarded $217,962.47. Since plaintiff RLI paid $20,000 of the $25,000 deductible, it is respectfully recommended that plaintiff RLI be awarded $20,000 from defendant. Finally, because Audobon absorbed the balance of the $5,000 deductible, it is respectfully recommended that an additional $5,000 be awarded to plaintiffs as reimbursement of the amount paid by Audobon.

d. Interest

Plaintiffs also seek interest on the total damages awarded from the date of the fire through the present. (Pls.' Aff. ¶ 16; see also Pls.' Letter dated Sept. 12, 2008 at 2). In New York, a prevailing party is entitled to prejudgment interest from the date that a breach of contract occurred until the date of final judgment. See CPLR §§ 5001-5002; Schipani v. McLeod, No. 06 CV 5733, 2008 WL 3553995, at *6 (2d Cir. Aug. 15, 2008); U.S. Naval Inst. v. Charter Communications, Inc., 936 F.2d 692, 698 (2d Cir. 1991). The statutory rate for such prejudgment interest is 9 percent per annum. See CPLR § 5004; Mars Elecs. v. U.S.A. Direct, 28 F. Supp. 2d 91 (E.D.N.Y. 1998); see also Hunter TBA, Inc. v. Triple V Sales, 250 F.R.D. 116 (E.D.N.Y. 2008). Based on the principal amount awarded of $242,962.47, the Court respectfully recommends that prejudgment interest be awarded to plaintiff at 9% per annum from the date of

December 15, 2005 to September 29, 2008, the date judgment is entered.[10]

Pursuant to 28 U.S.C. § 1961(a), litigants are entitled to post-judgment interest on money awards issued by a district court. Schipani v. McLeod, 2008 WL 3553995, at *6. Post-judgment interest is established by federal statutory authority and its accrual is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a); see also Int'l Consulting Servs. v. Cheap Tickets, Inc., No. 01 CV 4768, 2007 U.S. Dist. LEXIS 71689 at *30 (E.D.N.Y. Sept. 12, 2007). Since § 1961(a) does not allow "the exercise of judicial discretion in its application," see Akermanis v. Sea-Land Service, Inc., 521 F. Supp. 44, 57 (S.D.N.Y. 1981), rev'd on other grounds, 688 F.2d 898 (2d Cir. 1982), cert. denied, 461 U.S. 927 (1983), the plaintiffs are entitled to post-award, pre-judgment interest at the statutory rate prescribed by 28 U.S.C. § 1961.

e. Other Fees

Plaintiffs also seek to be reimbursed for $523 in costs and disbursements necessary to file the instant claim. (Pls.' Aff. ¶ 16). Under 29 U.S.C. § 1132(g)(2)(D), plaintiffs are entitled to reimbursement of filing fees and other specified court expenses. Plaintiffs have provided sufficient documentation of payment for service and filing fees. (Pls.' Aff. Ex. E). Of the $523 requested, $153 was paid to Global Process Service Co., Inc. for its first three attempts to serve the summons and Complaint. In addition, plaintiffs seek a $20 statutory filing fee and $350 for

---

[10]As of September 29, 2008, interest accrued at 9% equals $60,986.90.

14

the Clerk's fee required to file the Complaint. Accordingly, the Court respectfully recommends that plaintiffs be awarded $523.00 for filing expenses.

## CONCLUSION

Accordingly, this Court respectfully recommends that plaintiffs be awarded $242,962.47 in damages, $523.00 in costs, plus pre- and post-judgment interest accruing at the statutory rates.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**:

Dated: Brooklyn, New York
       September 29, 2008

                                              Cheryl L. Pollak
                                              United States Magistrate Judge